# EXHIBIT B – Part I

# Complaint For Damages And Injunctive Relief


CASE NO. **10CI00661**

JEFFERSON CIRCUIT COURT
DIVISION _____ ( )

VLADISLAV SEMENOV
PLAINTIFF
5903 Laurel Lane
Prospect, KY 40059

JEFFERSON CIRCUIT COURT
DIVISION SIX (6)

Vs.

## COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
## (JURY TRIAL DEMANDED)

AMERICAN EXPRESS TRAVEL RELATED SERVICES, INC.
200 Vesey St. Tax Dept.
New York, NY 10285

    Serve: CT Corporation System
           4169 Westport Road
           Louisville, KY 40207

-and-

AMERICAN EXPRESS CENTURION BANK CO.
4315 South 2700 West
Salt Lake City, UT 84184

    Serve: CT Corporation System
           4169 Westport Road
           Louisville, KY 40207

-and-

AMEX CARD SERVICES CO.
200 Vesey St. Tax Dept.
New York, NY 10285

    Serve: CT Corporation System
           4169 Westport Road
           Louisville, KY 40207

-and-

TRANSUNION, LLC
555 West Adams
Chicago, IL 60661


Cooper & Friedman
attorneys at law
PLLC

Serve: The Prentice Hall Corporation System
421 West Main Street
Frankfort, Kentucky 40601

-and-

EXPERIAN INFORMATION SOLUTIONS, INC.
700 Experian Parkway
Allen, TX 75013 or

Serve: CT Corporation System
Kentucky Home Life Building
Louisville, Kentucky 40202

-and-

EQUIFAX, INC.
1150 Peachtree Street, N.W.
Atlanta, GA 30309

Serve: The Prentice Hall Corporation System
421 West Main Street
Frankfort, Kentucky 40601

-and-

CSC CREDIT SERVICES
DEFENDANTS
3170 Fairview Park Drive
Fall Church, VA 22042

Serve: CT Corporation System
4169 Westport Road
Louisville, KY 40207

* * * * * * * *

Comes the Plaintiff, Vladislav Semenov (hereinafter "Plaintiff"), by and through counsel, and for his Complaint herein states as follows:

## PRELIMINARY STATEMENT

1. The Plaintiff brings this action for damages and equitable and injunctive relief based upon the Defendants' joint and/or several multiple, knowing, flagrant and continuous violations of the Fair Credit Reporting Act, 15 U.S.C. §§ 1681 et. seq. (hereinafter referred to as the "Act") and other law, including state statutory and common law, as specified herein below. Each of the state law claims asserted herein arise form the same common transaction(s) or occurrence(s) as the subject matter of Plaintiff's claims under the Act and are so related to the claims under the Act that they form part of the same case or controversy. Plaintiff seeks actual damages, compensatory damages, statutory damages, punitive damages, recovery of his costs and reasonable attorney fees expended in this litigation, and all other damages and relief to which he may be entitled. Plaintiff also seeks equitable relief, in the form of a temporary restraining order and/or preliminary and then permanent injunction, enjoining Defendants from committing further legal violations and compounding Plaintiff's damages, and Ordering them to immediately cease their erroneous reporting and to correct Plaintiff's credit information and consumer credit files. Plaintiff further seeks all other relief specified herein below or as authorized under existing law.

## JURISDICTION

2. Jurisdiction of this Honorable Court is conferred by 15 U.S.C. § 1681p and/or by other provisions of the Act which authorizes claims under the Act and related state law claims to be brought in state or federal court at the Plaintiff's election.

3

3. Plaintiff is a citizen of the United States, a resident of the Commonwealth of Kentucky with his address identified hereinabove. Plaintiff is a "consumer" as defined by § 1681a(c) of the Act, or otherwise by its terms and applicable law.

4. Defendants AMEX Card Services Co., American Express Centurion Bank Co., and American Express Travel Related Services, Inc. and their various divisions, subsidiaries and/or related companies or organizations (hereinafter together "American Express" or "Defendants" as the context may require) are, upon information and belief obtained after due inquiry, foreign corporations with their principal places of business as specified respectively herein above, or otherwise are domiciliaries of states other than Kentucky. Defendant regularly transacts business within the Commonwealth of Kentucky.

5. Defendants Trans Union, LLC ("Trans Union"), Equifax, Inc., ("Equifax"), CSC Credit Services ("CSC"), and Experian Information Solutions, Inc. ("Experian") are, upon information and belief, formed after due inquiry and further according to a review of the records of the Kentucky Secretary of State, foreign corporations incorporated under the laws of the states in which they are domiciled, as set forth hereinabove, or are otherwise domiciliaries of states or Commonwealths other than Kentucky, licensed to do business in Kentucky, maintain their respective principal places of business in such other states, and have appointed the above named entities as their statutory agents for service of process in Kentucky. Trans Union, Equifax, CSC and Experian are hereinafter sometimes collectively referred to as the "Agencies" or "Agency Defendants." Said Defendants regularly transacts business within the Commonwealth of Kentucky.

6. Upon further information and belief, CSC Credit Services is an independent CCRA which is affiliated with Equifax by contract, and which shares common data bases.

4

Under contract, Equifax and CSC share information concerning consumers within their data bases, depending upon the residence of the consumer and depending upon the geographic region in which they reside. Although the data on the Plaintiff is collected by Equifax, it is shared with CCS which by contract "owns" Plaintiff's credit file and CSC is, therefore, charged to the same extent as Equifax, with the duty to report accurate information to third persons accessing Plaintiff's consumer credit information. Defendant regularly transacts business within the Commonwealth of Kentucky.

7. American Express is regularly engaged in the business of soliciting, arranging, extending and/or providing credit and other financial accommodations, products or services to consumers and others, and as such they regularly furnish credit information to consumer credit reporting agencies and other third parties. The American Express Defendants are together or separately "furnishers" of consumer credit information as defined under the Act, in particular Section 1681(s)-2, or as otherwise set forth therein.

8. The Agency Defendants are consumer reporting agencies ("CCRAs") as defined in § 1681(f) of the Act or other of its provisions, as they are regularly engaged in the business of assembling, evaluating, dispersing, reporting and distributing information concerning consumers and their credit for the purposes of furnishing consumer reports, among other related products or services, as defined in Section 1681a(d) of the Act.

9. The Agency Defendants dispense such consumer reports or consumer credit information to third party subscribers, who access and use such information, under contract(s), for monetary compensation or for a fee.

## COUNT 1
### (Facts Applicable to All Claims)

10. In or around March 2003, Plaintiff obtained a Starwood Preferred Guest consumer credit card, with account number ending in 91003 (the "credit card"), from American Express. Upon information and belief, the card was underwritten and the credit line there under extended by or pursuant to an agreement with American Express or one of its affiliated companies.[1]

11. This credit card was issued as a consumer credit card and was at all relevant times used by the Plaintiff for the purposes of obtaining and/or purchasing goods primarily for personal, family or household purposes, all within the meaning of the Act and all other applicable Federal or Kentucky law.

12. At all times, the Plaintiff adhered to the terms of his agreement with American Express as to the use of the credit card. Plaintiff made payments for legitimate purchases or credit extensions timely, dutifully, and in accord with the terms of agreement/usage evidencing same.

13. In August 2008, the Plaintiff purchased an I-phone for personal use through E-Bay Seller and internet dealer GoDolphin Emirates. Plaintiff paid for this purchase through the use of the credit card.

14. Thereafter, on or about August 14, 2008, the Plaintiff made a second purchase from this same eBay seller to acquire additional I-phones, again using the credit card.

---

[1] The account number or card number has changed intermittently and has, in addition to the above number, been identified by American Express or others as account number ending in 91029, 9155, and 52663. Each of these accounts is believed to be the same account and as such all of them are hereinafter referred to simply as the "credit card" throughout this Complaint.

15. Unbeknownst to the Plaintiff, his credit card information was stolen by the seller or its principals, including a certain individual known as Brian Keith Combs ("Combs"). Mr. Combs or his company then wrongfully, unlawfully, and without authority used the credit card for fraudulent purposes, charging approximately $27,000.00 in unauthorized purchases to Plaintiff's credit card (hereinafter with interest and any and all fees applied to date, the "false charges").

16. Upon receiving a statement from American Express, the Plaintiff first realized in or around September, 2008, that he had been the victim of identity theft and/or that his credit card had been wrongfully and illegally used to incur all or a portion of the false charges.

17. Immediately upon learning that his card had been used for fraudulent purposes and that the false charges had been incurred, in September 2008, Plaintiff notified American Express to dispute the false charges and to obtain a correction from American Express in accordance with Plaintiff's legal rights, and consistent with American Express' legal obligations as a furnisher of consumer credit information under the Act.

18. At the Plaintiff's request and as a result of such notification, American Express initiated an investigation concerning its erroneous furnishing of said false charges. Thereafter, American Express agreed to issue a credit in the amount of $13,969.95 on the credit card on the basis of the information provided by the Plaintiff representing the amount identified by the Plaintiff and American Express as of that date which appeared to be fraudulent in nature.

19. Thereafter, however, American Express issued a written letter to Plaintiff on September 26, 2008, notifying Plaintiff that it refused to consider said charges as fraudulent

and that it was reinstating the total amount of such fraudulent charges to his American Express consumer credit card account.

20. On October 2, 2008 Plaintiff reported the fraudulent use of his consumer credit card to the Oldham County Police department, Commonwealth of Kentucky.

21. Plaintiff contacted American Express again, to report the false charges and to inform American Express that he was a victim of identity theft and that all charges incurred on the credit card between August 15 and August 20, 2008 had been fraudulently incurred. American Express denied his request for further investigation and refused to reverse the fraudulent charges from his credit card.

22. On October 2, 2008, Plaintiff's counsel wrote to "P. Hopkins" in the Fraud Department at American Express to dispute the fraudulent charges on Plaintiff's behalf. That letter identified the police report filed by the Plaintiff with the Oldham County Police Department, Commonwealth of Kentucky, and requested that American Express forward all "company records" upon which it based its decision to deny removal of the fraudulent charges from Plaintiff's account, as referenced in prior correspondence from "P. Hopkins" to the Plaintiff. Neither Mr. Hopkins nor anyone at American Express made response to this inquiry.

23. Also on October 2, 2008, the Plaintiff initiated an inquiry with each of the CCRAs and Agency Defendants by way of written correspondence sent by regular and certified mail, requesting that each CCRA investigate any and all inaccurate charges appearing on his American Express Account, and putting them on notice that he was victim of identify fraud. Pursuant to the Fair Credit Reporting Act, it is believed that the CCRAs

thereafter contacted American Express to conduct an investigation into Plaintiff's consumer notification as requested in his letter.

24. Throughout December, 2008, the Plaintiff continued to receive statements and correspondence from American Express demanding payment for the fraudulent charges. On December 9, 2008, after again being made aware of the dispute, American Express sent a letter to the Plaintiff advising him that "we have removed the disputed amount from suspense and closed our file for this inquiry."

25. Thereafter, on December 11, 2008, American Express sent the Plaintiff a letter advising him that although American Express had "investigated" his dispute and his claim for "$27,703.85," the company would "reject" the fraud claim on the basis that it did not have "sufficient information." However, again, on that date, American Express sent another letter to the Plaintiff advising him that it had "investigated" his fraud claim, and was rejecting the claim because "according to documented company records you released your account number to another individual" and as a result American Express could not "handle this as a fraud dispute" and the Plaintiff could "consider" the matter "closed."

26. On December 17, 2008, Plaintiff's counsel wrote another letter to American Express's Fraud Operations Dept., addressed to Mr. Hopkins and a Mr. Figueroa. That letter enclosed a copy of a letter from Deputy Sheriff Bernie Maness, which verified that the Randolph County Sheriff's Department in Asheboro, NC, had arrested Brian Keith Combs for computer crimes, and specifying its belief that the Plaintiff had been the victim of identify theft perpetrated upon him by Mr. Combs. A true copy is attached as Exhibit 1. Plaintiff's counsel demanded, on the basis of this information, that American Express

9

reverse the fraudulent charges, and refrain from any further attempts to collect them or to report them to any CCRAs.

27. Despite these notifications by the Plaintiff and by counsel, American Express continued to contact the Plaintiff and demand payment of the fraudulent charges during January and February, 2009.

28. On February 6, 2009, Plaintiff's counsel contacted American Express by phone to discuss these issues. After speaking with a representative identified by ID number 416631, Plaintiff was assured that the fraudulent charges would be reversed and the situation resolved. Unfortunately, that proved not to be the case.

29. Therefore, on February 10, 2009, Plaintiff's counsel wrote directly to American Express's General Counsel's office to apprise them of the situation. No response was forthcoming from American Express. However, during the remainder of February, 2009, the Plaintiff continued to receive phone calls and continued to be threatened and harassed for payment of the fraudulent charges.

30. On March 2, 2009, Plaintiff's counsel sent a letter to each of the CCRAs informing them of the dispute with American Express and requesting that any American Express Account be property reported in consideration of the information provided. Each of the CCRAs responded in March, 2009 by advising Plaintiff's counsel that they had implemented security alerts or were otherwise investigating the dispute.

31. On March 31, 2009, Stephanie Fogleman, a legal analyst for American Express, wrote to Plaintiff's counsel and advised that according to American Express "records" Mr. Semonov had "released his American Express Card to a third party" and

therefore, in accordance with the "card member agreement," he was "responsible" for the fraudulent charges.

32. The Card Holder Agreement does not contain any prohibition against a card holder, like Plaintiff, from utilizing his credit card to accomplish internet or telephone purchases, as the Plaintiff did in this case.

33. In March, 2009, American Express, in written correspondence, began to threaten Plaintiff that unless he paid the fraudulent charges, it would report his credit card account in negative status to the CCRAs, and his credit rating would be adversely affected.

34. During this time Plaintiff continued to make contact with American Express and its fraud department to resolve this dispute.

35. On April 7, 2009, after working for hours again on the phone with American Express, the Plaintiff obtained confirmation from American Express that it was "canceling" his account and assuring him that the fraudulent charges would be reversed and removed from his account. Plaintiff was also informed by American Express' fraud department that the fraudulent charges at issue would be stricken from his account and that he would be permitted to close his consumer credit card with American Express. A credit of $27,703.85 was applied to the account by American Express and subsequent statements issued by American Express reduced the balance of the account to "$0." A statement issued by American Express on April 24, 2009 indicates the account was closed as of that date, and that all of the previously reported charges had been credited on the basis of "fraud transactions." Plaintiff thus believed that his problems with American Express had, as of early April, 2009, finally been resolved.

36. To Plaintiff's surprise and dismay, the charges were only removed temporarily from his account. Shortly thereafter, on April 22, 2009 Plaintiff was advised by P. Hopkins in American Express' fraud department that the company had "inadvertently applied credits totaling $27,703.85" and informed Mr. Semenov that American Express was reinstating the full balance of the fraudulent charges.

37. On April 27, 2009, the Plaintiff contacted American Express again by phone, this time he was told that the company would not take any further action to assist him, and that if he wanted any further attention in this matter he would have to sue the company and should have no further contact with American Express.

38. On April 29, 2009, P. Hopkins in the fraud department again sent a letter to the Plaintiff advising him that American Express still had "insufficient information" to provide the documentation he requested in support of its decision not to reverse the fraudulently incurred charges.

39. All of the fraudulent charges, including interest, finance charges and penalties, were then reinstated on the Plaintiff's credit card account, during the next billing cycle, the total claim being assessed in May, 2009, for $28,368.90.

40. The reinstatement of the total sum of said fraudulent charges imposed a severe financial burden on Plaintiff and caused him to be unable to satisfy monthly payments for amounts requested by American Express.

41. As a direct and foreseeable result of its actions, American Express created an intolerable financial situation for Plaintiff, causing him great emotional, mental, and financial damage.

42. This damage was further exacerbated by American Express' cancellation of credit to Plaintiff on July 6, 2009. As a result, the Plaintiff was deprived of credit availability and opportunity solely upon the basis of American Express' unwillingness to credit his account for the fraudulent charges.

43. Thereafter, American Express forwarded the credit card account to outside counsel, Zwicker & Associates, P.C., for collection. On July 24, 2009 said counsel served a threatening collection letter to the Plaintiff, demanding payment for the fraudulent charges committed on Plaintiff's American Express consumer credit card.

44. Upon information and belief, during this period, American Express or others on its behalf also began reporting the Plaintiff's credit card and the account(s) related thereto to one or more of the CCRAs as being in default, delinquent, in collection or in another form of negative or adverse status.

45. In response to this letter, Plaintiff's counsel contacted Zwicker & Associates in writing on August 4, 2009, to notify it that the Plaintiff was the victim of identify theft, the charges were disputed, and further requesting verification and validation of the debt in accordance with the Fair Debt Collection Practices Act, and advising that the account was not in default and should not be reported as such to any CCRA.

46. At or around this time, the Plaintiff also contacted the CCRAs to inquire regarding the status of credit and how his American Express account was reporting. At that time, according to a report obtained from Trans Union dated August 14, 2009, the credit card account was not reporting in delinquent status but rather was reporting the account as "paying as agreed" at that time.

47. However, American Express thereafter again denied the fraudulent nature of said charges in writing on September 2, 2009, reinstated its decision, and stated that Plaintiff could "consider this case closed."

48. On September 23, 2009, it was reported in the Asheboro Courier Tribune that a "scam artist" named Brian Keith Richards, the same person with whom the Plaintiff dealt, had been arrested and was being held under a $250,000.00 bond for "internet fraud in numerous states for using numerous stolen identities and numerous stolen credit cards [and account information]. . . ."

49. On November 16, 2009, Plaintiff learned from his review of his Trans Union credit report that American Express was now improperly reporting his credit card in negative status, specifically, as a "Collection Account" and listing the status as an "individual account" with an account balance of $28,406.00 as of 10/2009.

50. On November 18, 2009, the Plaintiff sent another notice of dispute to Trans Union requesting that it again conduct an investigation, and that it contact the source of the false information (American Express) to verify the information, thereby triggering the respective defendant's duties of investigation and reinvestigation under the Act.

51. Plaintiff alleges that the CCRAs contacted American Express through the E-Oscar or other appropriate electronic system, that an investigation was initiated, and an ACDV or other appropriate documentation was delivered by American Express in response to the CCRA inquires.

52. In the meantime, during this period in October and November, 2009, the Plaintiff lost additional credit opportunity when his Barclays Bank of Delaware and his Chase credit cards were cancelled on the basis of Trans Union and Experian reports